Judge Wu, my daughter just graduated summa cum laude in your district at Cal Poly and is attending U of A Law School. Is that a pre-clerkship request or something? She's going to attend which law school? She's in law school at the University of Arizona, my alma mater. We'll forgive you then. My husband teaches at Brand X. Your honors, my name is Tom Higgins. I am the appellant's attorney in this case. You have two of them before you today. I am the trial attorney on the first one. And in the second one, I wasn't a trial attorney, but I was the attorney that did the material witness depositions. That's important, I think, to keep in mind. The first case is called the Golden State Bus Case. That case started on a rather odd note. A trial judge, Judge Collins, made a ruling pursuant to Crawford v. Washington, that the government could not use the INS form, I-213, Border Patrol forms, to establish alienage. He also said that it may not refer to the people that were apprehended at various points in time as illegal aliens, presumably because that was part of the proof. So they were to be referred to as people. But the next thing was he allowed the government to do what I call profile evidence of what illegal aliens look like and act like. The problem with this is, is that there was no proof through the trial of the actual alienage of any single person except Maria Canul. Now ‑‑ Counsel, let me stop you there. We have ‑‑ that's the third incident. Is that the ‑‑ The nightstand, I call it, Judge, yes. The May 2001 incident. Correct. They hold Maria as a material witness. So we do know that she was an unlawful alien. That's correct. Okay. In the prior incidents, though, we did have evidence of persons, of a substantial number of persons who were voluntarily returned to Mexico. Now, what can we draw or can't we draw from that fact? Well, the fact of the matter is, there was never any testimony except that they were processed and removed. And I think there's a conclusion the jury could have very easily made, that those people were here illegally and were removed, even though the judge forbid them to use that kind of language. But he did let them use that. So I think that is proof, is some proof of alienage, but it's not definitive. They could have had the names of the people. And I'll give you an example, and I believe I mentioned it in the brief. There was no testimony that, for instance, Mr. Ortiz Herrera was walking single file, had a long shirt, was apprehended, was wearing four shirts, had no luggage, and was processed and removed. That never happened. It was just an overall, these are the factors, and then that these people were taken and removed. Now, the interesting part of all this is, is that Judge Collins, after the testimony of Maria Canul, after the close of the argument, granted a Rule 29 motion on Count 102. Now, the three counts were in the so-called Knight's Inn incident where Ms. Canul was. That was the bringing in count. It was argued at the same time, well, Count 87 is exactly the same thing. That dates back to what I call the Knocko incidents, which was the first of three incidents. That was the November 99 incident, because that was a bringing in count. Now, we now have, because of this Court's decision, we were notified by the Rule 28 by letter, and Mr. Berg also dealt with it, of United States v. Angelica Lopez. And that case is quite candidly, I mean, quite frankly, the government said that might be reversible error alone, but said it is still up in the air as far as the Solicitor General appealing that case. But I think it's pretty definitive here. You have to bring them in. That's part of it. And so you have to bring what in? Bring illegal aliens. Bring undocumented people in. You have to bring them in and put them on the stand and? No, no, no. No, no, no. The language in 1324a has harboring or transportation, harboring, concealing, and, and, I might add, bringing into the country. Well, but the facts in that case was that, was that the defendant there picked the aliens up when they're in this country. Right. And there was, the argument was that just the fact you pick up undocumented aliens doesn't show that you aid and abetted bringing them in. But it said that you could, the government could show, if they had something more than that, although they didn't say what, that there was aiding and abetting in addition to just picking people up in the country who are undocumented. And I think there's a logical link between certain activities, and we'll hear about it in the next case, but in these cases, there was no testimony. There was very detailed testimony of how Ms. Canole came through Yucatan, came all the way through the border, got in, and ended up at the Knight's Inn, not being able to identify Mr. Garcia Jaramillo. But the point of the matter is, is there was no evidence that. Well, but what about the, I thought there was the notebook with the defendant's nickname in it with reference to smuggling fees, and, you know, there's a reference to, quote, aliens belonging to Tia, which was, there was testimony that that was the defendant's nickname. Are you talking about the ones that was so-called smuggler's notebook at the Knight's Inn? Yeah, that was the one, that was the May 2, 2001. Right. And, in fact, they had signatures that were admitted at trial showing a signature on the smuggler's notebook. That's true. No, it wasn't in the defendant's handwriting, obviously, but there was a reference in there to him. Why isn't that circumstantial evidence? Why isn't that sufficient? Well, I think it is circumstantial evidence, but it's not enough of a link because there was no testimony who brought her in and what happened, the same thing as United States v. Angelica Lopez. It's clear they got in here somewhere, but what is the role of the defendant charger? Well, if you draw the circumstantial inference that it references to smuggling fees for aliens belonging to Tia, that Tia was involved in collecting monies to bring the people from the foreign country into the United States, which would constitute the offense. Well, that's where I disagree with you. There was no testimony that he was receiving money. There was a lot of testimony, particularly through the 404B, that he had money on him at various points in the past, but not in any of those three incidents. Absolutely zero. But I think that's an improper inference to be drawn from it. I'd like to go on the next thing, and I don't know if Your Honors could tell from the cold record, but it's absolutely true. Half to two-thirds of that trial was 404B. Now. I'm sorry. I thought there was evidence that he had a lot of cash on him in one of these episodes. No. There was evidence that he had cash on him in the 404B incidents, but not during the substantive counts. Oh, I see. Okay. Now, there's one called, the middle one, called the plumber, I call it the plumber terminal one, where he talked to the undercover agent. He complained about money being taken from him in Bisbee, or excuse me, in Cochise County, and that also turned up in the 404B acts. And that's one of the ways the government's linked him with their charges of conspiracy. But he did not. Counsel, can they bring the 404B, most of the 404B stuff, I won't say all of it, but most of it appears to me to be sort of uncharged activities. In other words, it's all part of the overall conspiracy. And this is an ongoing conspiracy. It goes on for many, many years. And maybe your client's just fortunate they didn't get charged with all of that. You still have to combat it in much the same way that you would had he been charged it. But, you know, at the end of the day, at least the jury isn't going back there thinking about it. So, you know, maybe you don't want to complain too loudly about that. But it does seem that these are uncharged acts and certainly part of an overall conspiracy. We have the same players that seem to be involved here and the same patterns that seem to be involved. Well, I would say certainly, particularly the 92 of the second. The 92, the 92 is sort of outside the scope. But there you do have a similar act and he pleads guilty. Well, that's right. He did. So I'm not, it's outside of the scope at least time-wise of the conspiracy, even though it's said if not before. But he pled guilty to that. It's to me kind of a classic 404B type of thing, except for the length of time. But I would draw your attention to the fifth one, which is September 13th, 99. All that is, is that an agent saw my client's car the night before. And when he pointed it out to Mr. Garcia Jaramillo, who had told him that he was in San Diego prior to that, Mr. Garcia Jaramillo changed his story. How can that be a prior bad act, telling a fib? It does provide a link because your client is stopped in the Ford Expedition, which shows up in other acts. So there is a link with him because the Ford Expedition is involved in subsequent descriptions. The Ford Expedition only turned up in the Plummer Terminal incident where the undercover agent, Frank Barola, said that he had seen him in it numerous times and in the 404B acts, I think three of them, from Cochise County, where he had, in fact, been driving that vehicle that was registered to him with California plates. So, but they could have, I mean, that is, to me, another example of the government bringing in inappropriate and marginally relevant information under 404B. He told him a lie and he really had seen his car the night before. That, well, anyway, that seems to be improper use of it. There are nine separate 404B acts. Two of them were excluded, but nine were included. The, for instance, the February 20th, 1999 one where Mr. Cipriano-Pineda, who, for your Honor's information, he was charged as a co-conspirator, never arrested. He was not in this, but he was charged in the original and all the. Who else was arrested and charged in this case? Basically, well, Mr. Well, there was approximately 35 of them. They revolved around the Gonzalez family who owned and operated. Owned the Golden Bus. The Golden State, correct. And some of the terminal operators, some of the ticket people. The wiretaps did not apply to my client. Those all were set at the Mariana Terminal in Los Angeles. My client was the only one that went to trial. Were either of his brothers charged? Yes. Both of them were charged and just, if my memory is correct, Alfonso Garcia pled out as well as Ubaldo Fuentes, who is his brother. So both Fuentes and Garcia pled out? That's correct. But Cipriano-Pineda was not charged? To this day, as far as I know, not apprehended. That's correct. Now, the government went to great trouble to link those people together. In fact, it got to the point where in the December 6, 2000, number eight of the prior bad acts, they mentioned that Alfonso Garcia was stopped with $15,000, and that's it. And he got the money back, and that was it. That is a tenuous link at best. I thought there were names, numbers, and cities also with the money. I'm sorry. There's a list of names, numbers, and cities. On the envelopes? Yes. But the name of my client was on there. There was the name Cipriano on there. That's one of the names that were on there. And they had city names also on the envelope that the cash was in. But tying that link, it's very much like the case where ---- The problem is that Pineda is also involved with your client in other matters. In other words, sometimes they're caught separately, sometimes they're caught together. Well, I think a more proper wording would be we're stopped together. And one time the ID is in my client's sock, and the other time the residence listed on the driver's license of Mr. Pineda happens to be the same one as Mr. Garcia. I know this type of form ---- Yeah. That's a good argument for the jury, I think, isn't it? If I remember correctly, it was probably made good. Counsel, I'm struggling just a little bit to try and focus on precisely what your argument is before us. Your argument in the blue brief is that there's insufficient evidence, and your client is convicted of conspiracy. Now, is your client claiming that there was no conspiracy and, therefore, there's insufficient evidence of any conspiracy at all and, therefore, he can't be convicted? Or is your client conceding there may be a conspiracy, but my client wasn't part of it? I would say that Mr. Berg is correct in his assessment that you can have a conspiracy. You don't actually have to prove the agreement. Justice Schroeder and I decided to hog the dope. You don't have to have those words. You can do it by inferring from a concerted activity the goal or accomplishment. And I think that was what was going on here. What I'm saying is, is that the evidence of the conspiracy contained one phrase that now, I think, under Angelica Lopez is prohibited. That conspiracy count said that he was transporting, harboring, concealing, and bringing in. So that. And the second thing is, is the government used a shotgun approach to prove elements of the conspiracy. Well, if he's part of the conspiracy, do they have to show, does the government have to show that Mr. Garcia-Caramillo was physically bringing people in, or did they just have to show him that he was part of an agreement to bring people in? I think they have to show that he was. I think the Conspiracy Committee established if they can show that the illegals were being brought in and that was part of the conspiracy, if they can show that. Okay. Very precisely then, what elements of the case is there insufficient evidence of? I understand your first point, which is that there's insufficient evidence to support that people who were being brought in and transported between the Hotel Olivia Nogales and from Tucson to Phoenix and Phoenix to Las Vegas to Los Angeles by Golden State in fact were aliens except for Maria. So there's point one. That is that the evidence for the, there might have been a conspiracy to move people around, but it may be a completely lawful conspiracy in the sense that, you know, Greyhound moves people but there's no evidence that they were illegals. Okay. I understand that point. What other point, what other point is the government proved insufficient evidence? I would say that the other point as far as the substantive counts, they would not have been able to prove without the 404B. Now, that's not improper. You can use the 404B if as long as it's not showing that the person is a bad person, that type of evidence. Mr. Berg posits that 404B should be allowed unless it's solely for that purpose. Okay. But we can argue about whether the evidence should be admitted or not. You're telling me that there's insufficient evidence. Now, given that the 404 is there, what is it insufficient to prove? I understand your first point is it's insufficient to prove alienage. Right. Okay. Do you have a second point? Yes. The insufficient to prove that the, he had was an active member of the conspiracy, because you have to remember, Your Honor, his, even the testimony from the undercover agent at the Plummer Terminal did not show him moving people. He had him going over to a car that people came out of and talking to him. And the testimony of the agents at the Night Sand, which is the third incident, they said they saw him there, but the Lady Maria Canul didn't. What I'm saying is his connection to those people is marginal and insufficient. Okay. So there may have been a conspiracy, but your client wasn't part of the conspiracy. Right. And particularly the part of it that was charged as the bringing in. Okay. Do you have a third point?  Okay. And I'm at my time now. Would you like to reserve the rest of your time? I would, and I reserve my balance. Thank you, Your Honor. May it please the Court. My name is Bruce Ferg, Assistant United States Attorney on behalf of the government. I think I can clarify some of the questions that were answered or, excuse me, asked of Mr. Higgins. First of all, with regard to Judge Schroeder's question, there is in the first charged incident in which he was found together in the same vehicle with Mr. Pineda, and within a short distance of the vans that were carrying all these people stacked up like cordwood, there were three different envelopes in his respective pockets which contained various sums of money and contained the kinds of information such as Judge Wu referred to as far as destinations, phone numbers, and so forth, which the expert evidence indicated was typical of smuggling operations. So we have him acting apparently in the role of a typical overseer, kind of riding a herd a short distance away so he's insulated, but nonetheless keeping track of that particular expedition where the two vans had picked up the people immediately by the border. So there is in the one charged incident, the first one, direct or more of a connection to actual receipts of money. But, again, we're talking about a conspiracy which typically is proved by circumstantial evidence in which the jury is allowed to draw reasonable inferences from these miscellaneous facts. It's Dean Wigmore's own aphorism about a brick is not a wall. You can have little pieces of evidence put all together to create the whole picture, and that's exactly what was being done appropriately in this case. Now, one of the first things that Mr. Higgins addressed was the district court's ruling with regard to references to the people as aliens, and that leads into the question of the proof of alienage. What the district court actually said, and I quote this on page 58 of my brief, is that the witnesses would be permitted to describe the characteristics of the people they observed but could not, absent other evidence, call them an illegal alien or an undocumented alien. And the kind of other evidence that would permit the agents to use those characterizations would include the conspirators themselves had referred to the people as illegal aliens. In each of the incidents in which he ---- I'm sorry, let me just clarify. So the district court would allow you to indicate, for example, that Mr. Garcia had referred to the people in the vans as poyos. Exactly. And that's exactly how all of this evidence came in. The district court was concerned appropriately that it not be kind of an unsupported legal conclusion that was impressed on the jury by the witnesses calling everyone and sundry without any clear evidentiary basis for it an illegal alien. So he said there has to be an evidentiary basis. And is Garcia's admission that these are poyos understood in context to mean illegal aliens, is that sufficient to prove the fact of their illegal status? I would suggest that it's very strong evidence. It's kind of like the drug user who says, yeah, that was good marijuana. He knows what he's talking about. But that was certainly not all that there was. In each of these incidents, we have, for example, the appearance and demeanor evidence of these people who were, in effect, acting like illegal aliens, which were described not just by the experts, the agents, but the same kind of appearance and demeanor was described by Maria Canule herself, about herself and how the people that she came in with were acting. And also there was a – I believe her name was Alma Rodriguez, who worked in the Golden State Terminal as a ticket agent and was one of the ones who was referring to poyos, selling the blocks of tickets and so forth, and had grown up in Nogales right on the border and, again, described the same kinds of characteristics. So we have all of that. Plus, as Judge Bivey referred to, in each of these incidents where the cartloads of people were taken into custody, they were processed as illegal aliens and removed to Mexico. And this Court's case law says that's the kind of thing that doesn't happen to a United States citizen. So the reasonable inference is that having to do with – Not often, I think, should be the qualifier. I suppose it's possible that there were mistakes made, but I'm not aware of any cases addressing that, and I would assume that it's fairly rare. Again, we're talking about the generalities and the reasonable inferences that – There's no problem with using circumstantial evidence to establish alienage? No. As a matter of fact, I think that's the whole point of the Crawford issue, is avoiding the hearsay and so doing it by other means. Now, I want to address the Court's concerns as far as the overall sufficiency of the evidence. Again, what we're talking about is doing this circumstantially, because that's what you have to do with a conspiracy. The so-called 404B evidence, as I argued in the brief, if you take a close look at it, the vast majority of it simply goes to the conspiracy. You don't even have to analyze it under terms of 404B, because it was legitimate circumstantial evidence indicating the kinds of characteristic patterns of behavior and the things that the defendant was doing. He didn't have to, under the law of conspiracy, be actively engaged. That's the whole point of the conspiracy. That is what the group does, and each individual is responsible for what the others do, even if he's not physically present or participating. But it's noticeable that we do have, for example, in the third charge incident, where we have Maria Canula coming all the way from Yucatan, being taken across the border, stashed at the Knight's Inn, taken on the bus, and then to the Fillmore House in Phoenix. The defendant is present at the Knight's Inn together with Alfonso, watching as this goes on. How are they conveyed? By the white ORT van that shows up in so many instances. There is the blue expedition that he loves so much. And it wasn't just the defendant who was using that, it was the other co-conspirators. There was also evidence from the clerk at the Knight's Inn that they were required to buy Alfonso slash Poncho, that was the name he also went by, to keep records of when other people were driving the blue expedition. So this kind of internal checks and balances or control by the conspiracy to see what everyone was doing, how it was being used. So basically what we have is a fairly classical conspiracy case, where the evidence was appropriately brought in to prove the conspiracy. I would suggest that the vast majority of it also fit 404B. And again, look at your standard of review. As I analyzed it, there was no real 404B objection even made. So what you're looking at is only for plain error. And it clearly was not that. If the Court has other questions about this case, I'd be glad to ask them. If not.  Thank you. Thank you. Don't appear to be any. Thank you. Thank you. Briefly, the Your Honor had asked me if I had any other things I was complaining about concerning the proof problems and the conspiracy. I would also add to it, I just saw in my notes, that the proof for commercial or private gain, that was not shown by anything except 404B evidence that he got stocked with money on him from time to time. And there wasn't any linking. I would just add that to it. And what I would, in response to the government's argument right now, I would point out that the first charged incident when he was stopped, I believe Mr. Berg misspoke. He said he was stocked with pinata. That is not. He was not. That's the incident where there was two maroon vans and a white truck of some sort near the border where the border patrol agent was two miles away with binoculars. They followed him. They stopped the vans. And then two miles behind was Mr. Garcia-Jaramillo. They stopped him. He was alone. But I just think Mr. Berg misspoke about that. But that was also the one where one of the maroon vans was still titled in Mr. Garcia-Jaramillo's name. And there's no way to get around that. That happened. And finally, I would bring up that this court in Camacho Davalos, there was a finding that Mexican-appearing people in a truck that only spoke Spanish and had no legal documentation was not sufficient. And that's not even as much as we've got here. We've just got profile. Thank you. Okay, thank you. The case just argued is submitted for decision. We'll let you reorganize your papers and we'll hear the next case, which is also United States v. Juan Garcia-Jaramillo. This is number 0610184.
judges: Schroeder, Bybee, Wu